Mary Legree SHAHID, Plaintiff–Appellant,

v.

FORD MOTOR COMPANY, Defendant–Appellee.

No. 94–1792.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 17, 1995.

Decided March 1, 1996.

Robin H. Kyle (argued and briefed), Robin H. Kyle, J.D., LL.M., Detroit, MI, for Mary Legree Shahid.

Lauren A. Rousseau, Sarah G. Tomai (argued and briefed), Ford Motor Co., Dearborn, MI, for Ford Motor Co.

Before: BATCHELDER and MOORE, Circuit Judges; ENSLEN, Chief District Judge.*

MOORE, Circuit Judge.

Appellant Mary Legree Shahid appeals the district court's grant of summary judgment in favor of Appellee Ford Motor Company ("Ford") on Shahid's claim that Ford terminated her employment in order to deprive her of the benefits of Ford's Voluntary Termination Plan ("VTP") in violation of Section 510 of the Employee Retirement Income Se-

---

* The Honorable Richard A. Enslen, Chief United States District Judge for the Western District of Michigan, sitting by designation.

curity Act of 1974 ("ERISA"), 29 U.S.C. § 1140. We affirm.

### I

Ford terminated Shahid in February 1991, because she violated Ford policy by accepting and coercing commissions or kickbacks from a travel company for referring Ford business to them. Before discovering Shahid's misconduct, Ford had planned to terminate her as part of company-wide "head count reductions." When Shahid was informed that her position would be eliminated, she inquired whether she could participate in the VTP, which is a severance plan through which Ford selects employees to terminate their employment voluntarily in return for severance pay, reemployment assistance, special retirement benefits, and other benefits. On December 5, 1990, Shahid met with two of Ford's Employee Relations associates, who provided her with details about the benefits offered under the VTP and offered her a 30–day "open window" period to consider voluntarily terminating her employment under the plan. On December 17, 1990, Bernard Restuccia, Shahid's supervisor, recommended that she delay her "acceptance" of the VTP because Ford was considering adopting a new special early retirement plan that might be more beneficial to her. He also extended her "open window" period until January 31, 1991.

Before Shahid formally requested that Ford allow her to participate in the VTP, Ford received from Ruby Thompson, the president of a travel company, a letter dated December 4, 1990, indicating that Shahid had accepted and coerced commissions or kickbacks from Thompson in exchange for referrals of Ford business to the travel company. On December 18, 1990, during a meeting with two Ford representatives, Shahid admitted that she had accepted "commissions" on Ford business. Later that day, Restuccia suspended Shahid with pay pending the outcome of an investigation of her conduct. Shahid inquired whether this matter would affect her eligibility for the VTP, and Restuccia told her that all employment matters were on hold pending the outcome of the investigation.

On January 2, 1991, Ford in-house counsel Nancy Schott advised Shahid's attorney by telephone that Shahid was not eligible for the VTP. Despite her ineligibility, Shahid notified Ford by letter dated January 11, 1991, that she had decided to participate in the VTP. On January 24, 1991, Schott sent Shahid's attorney a letter reiterating that Shahid was not eligible for the VTP. On February 15, 1991, Restuccia terminated Shahid's employment at Ford based on a recommendation from Employee Relations, which concluded that Shahid had violated Ford's Policy Letter C–3 governing "Standards of Corporate Conduct."

### II

■ Shahid argues that the district court erred by granting Ford's motion for summary judgment on Shahid's claim under ERISA § 510 that Ford terminated her employment for the purpose of denying her benefits under the VTP. This court reviews a district court's grant of summary judgment de novo, applying the same test that the district court utilizes. *Adkins v. United Mine Workers,* 941 F.2d 392, 399 (6th Cir. 1991), *cert. denied,* 502 U.S. 1098, 112 S.Ct. 1180, 117 L.Ed.2d 424 (1992). Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if there is no genuine issue of material fact and if the movant is entitled to judgment as a matter of law.

■ Section 510 of ERISA makes it unlawful for an employer to terminate an employee for the purpose of interfering with the employee's rights under an employee benefit plan:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ..., or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. Furthermore, section 510 provides that "[t]he provisions of section 1132 of this title shall be applicable in the enforce-

ment of this section." *Id.* Section 1132, ERISA § 502, states that

A civil action may be brought—

. . .

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

29 U.S.C. § 1132(a)(3). Section 510 was primarily designed to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler,* 621 F.2d 240, 245 (6th Cir.1980).

■ We agree with the district court's finding that the VTP is an ERISA plan.[1] ERISA applies to any "employee benefit plan" under ERISA, which is defined as an "employee welfare benefit plan," an "employee pension benefit plan," or a "plan which is both." ERISA § 3(3), 29 U.S.C. § 1002(3). The term "employee welfare benefit plan" means

any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants . . . (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title. . . .

ERISA § 3(1), 29 U.S.C. § 1002(1). The term "employee pension benefit plan" means "any plan, fund, or program . . . established or maintained by an employer . . . to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program . . . provides retirement income to employees. . . ." ERISA § 3(2)(A)(i), 29 U.S.C. § 1002(2)(A)(i). "The hallmark of an ERISA benefit plan is that it

requires 'an ongoing administrative program to meet the employer's obligation.'" *Swinney v. General Motors Corp.,* 46 F.3d 512, 517 (6th Cir.1995) (citing *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 11–12, 107 S.Ct. 2211, 2217–18, 96 L.Ed.2d 1 (1987) (finding ERISA inapplicable to a Maine statute where a "one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation.")). In determining whether an ERISA plan exists, this circuit has stated that

"[s]imple or mechanical determinations do not necessarily require the establishment of . . . an administrative scheme; rather, an employer's need to create an administrative system may arise where the employer, to determine the employees' eligibility for and level of benefits, must analyze each employee's particular circumstances in light of the appropriate criteria."

*Sherrod v. General Motors Corp.,* 33 F.3d 636, 638 (6th Cir.1994) (quoting *Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 257–58 (8th Cir.1994) (holding that "golden parachute" for executives was not an ERISA plan because it did "not require establishment of an administrative scheme")). "The need for an administrative scheme may also arise when the employer 'assumes . . . responsibility to pay benefits on a regular basis, and thus faces . . . periodic demands on its assets that create a need for financial coordination and control.'" *Swinney,* 46 F.3d at 517 (quoting *Fort Halifax Packing,* 482 U.S. at 12, 107 S.Ct. at 2217–18)).

■ Severance pay plans are included in the definition of 29 U.S.C. § 1002(1)(B), which refers to section 302(c) of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 186(c), to illustrate the types of benefits characterized as employee welfare benefit plans under ERISA. Since section 186(c)(6) describes "pooled vacation, holiday, severance or similar benefits," such benefits qualify as employee welfare benefit plans. *See also* 29 C.F.R. § 2510.3–1(a)(3) (plans

---

1. Finding that the VTP is an ERISA plan is important not only with respect to the applicability of section 510, but also to establish federal

question jurisdiction under 28 U.S.C. § 1291. *See Swinney v. General Motors Corp.,* 46 F.3d 512, 517 (6th Cir.1995).

which provide severance benefits are within definition of "welfare plan"). Thus, Ford's VTP is an ERISA plan since the "major features" of the plan "include (1) substantial severance payment; (2) professional re-employment assistance; (3) continuance of medical (excluding dental/vision) and life insurance coverages for up to one year; and (4) retirement 'grow-in' provisions." Voluntary Termination Plan Summary, J.A. at 65, 69. *See, e.g., Massachusetts v. Morash,* 490 U.S. 107, 116, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989) ("plans to pay employees severance benefits, which are payable only upon termination of employment, are employee welfare benefit plans within the meaning of [ERISA]").

■ On review, this court must determine whether Shahid is a "participant" under ERISA, which is essential to this court's jurisdiction and her standing to sue. If Shahid is a "participant," we must decide whether Ford discriminated against Shahid for the purpose of interfering with the receipt of any benefits to which she may have become entitled under the VTP. The Sixth Circuit applies the *Burdine* burden-shifting approach where "there is no direct evidence of the employer's motivation." *Humphreys v. Bellaire Corporation,* 966 F.2d 1037, 1043 (6th Cir.1992) (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). We must affirm the district court's decision if Shahid either failed to state a prima facie case or failed to rebut Ford's articulated legitimate nondiscriminatory reason for terminating her employment.

## III

■ As a threshold matter, this court must determine whether Shahid has standing to sue Ford under section 510. Although the parties do not directly raise this issue on appeal, we must address it "because standing is necessary for our exercise of jurisdiction." *Swinney,* 46 F.3d at 518 (citing *United States v. Van,* 931 F.2d 384, 387 (6th Cir.1991)). Shahid has standing to bring an action under ERISA § 510 only if she is a "participant," which is defined as "any employee or former employee of an employer ... who is or may

become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer...." ERISA § 3(7), 29 U.S.C. § 1002(7). *See also* 29 C.F.R. § 2510.3–3(d)(1)(i) (stating that "[a]n individual becomes a participant covered under an employee welfare benefit plan [by the] date on which the individual becomes eligible under the plan for a benefit subject only to occurrence of the contingency for which the benefit is provided").

■ The Supreme Court has rejected an interpretation of the definition of "participant" that would allow an ERISA action to be brought by anyone "who claims to be a participant or beneficiary." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 117, 109 S.Ct. 948, 957, 103 L.Ed.2d 80 (1989) (citation omitted). The Supreme Court reasoned that "[t]o say that a 'participant' is any person who claims to be one begs the question of who is a 'participant' and renders the definition set forth in [ERISA] § 1002(7) superfluous." *Id.* Rather, the Court held that, with respect to former employees, the term "participant" should be read to mean "former employees who have ... a reasonable expectation of returning to covered employment or who have a colorable claim to vested benefits." *Id.* (internal citations omitted). Thus, in order for a claimant to establish "that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." *Id.* at 117–18, 109 S.Ct. at 958.

Nonetheless, this court has noted that the Supreme Court's definition of the term "participant" under ERISA "was developed outside of the standing context." *Swinney,* 46 F.3d at 518 (citing *Drennan v. General Motors Corp.,* 977 F.2d 246, 250 (6th Cir.1992), *cert. denied,* 508 U.S. 940, 113 S.Ct. 2416, 124 L.Ed.2d 639 (1993) and *Vartanian v. Monsanto Co.,* 14 F.3d 697, 701 (1st Cir.1994)). Therefore, this court has found that a former employee has standing as a "participant" where, but for the alleged misrepresentations or breaches of duty by fiduciaries, the employee "would have been in a class eligible to become a member of the plan." *Swinney,* 46

F.3d at 519. *See also Drennan,* 977 F.2d at 248–50 (laid off employees who terminated their employment relationship by taking a lump-sum buyout payment were "eligible" in that, prior to the employer's alleged misrepresentations that a better package would not be offered to them, they had been members of the class of employees to whom the more favorable plan was eventually offered).

■ In the instant case, Ford apparently considered Shahid potentially eligible for the VTP before discovering her misconduct. Ford representatives met with Shahid to describe the benefits provided under the VTP and offered her an "open-window" period during which Ford would accept her application. Shahid argues that if Ford had not improperly terminated her, or had not induced her to delay her "acceptance" of the VTP, she may have become eligible to participate in the VTP. Thus, Shahid has standing to bring this action as a "participant" in an ERISA plan.

## IV

■ We must next determine whether Shahid stated a prima facie case under section 510. To state a prima facie case, an employee must show that there was: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Humphreys,* 966 F.2d at 1043 (citing *Gavalik v. Continental Can Co.,* 812 F.2d 834, 852 (3d Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987)). Thus, the plaintiff "must show that an employer had a specific intent to violate ERISA." *Humphreys,* 966 F.2d at 1043 (quoting *Rush v. United Technologies, Otis Elevator Div.,* 930 F.2d 453, 457 (6th Cir. 1991)). However, the plaintiff need not show that the employer's sole purpose in discharging her was to interfere with her entitlement to benefits but rather only that it was "a motivating factor" in the decision. *Humphreys,* 966 F.2d at 1043.

■ Relying on *Humphreys,* the district court held that Shahid had stated a prima facie case because "the proximity of the dis-charge to the offer and subsequent with-drawal of the offer to participate in the VTP program [was sufficient to] provide ... an inference ... of intentional discrimination." In *Humphreys,* the Sixth Circuit found that the plaintiff had stated a prima facie case under section 510 by alleging that "his pen-sion would have vested ... two months [after his termination] and that this would have cost the company a substantial amount." *Id.* at 1043–44. The *Humphreys* court reasoned that "the proximity to vesting provides at least some inference of intentional, prohibit-ed activity." *Id.* Similarly, in *Dister v. Con-tinental Group, Inc.,* 859 F.2d 1108 (2d Cir. 1988), the Second Circuit concluded that the plaintiff had "made out a prima facie case sufficient to withstand summary judgment" because his discharge four months and seven days before his rights in an ERISA plan were to vest, which resulted in a substantial savings to the defendant, gave rise to an inference of discrimination. *Id.* at 1110, 1115 (where plaintiff's basic pension rights had already vested, the Second Circuit found that plaintiff had stated a prima facie case under section 510 because he was fired shortly be-fore his rights in an enhanced benefit pack-age were due to vest).

Ford contends that *Humphreys* and *Dister* are distinguishable because those cases deal with plaintiffs who were terminated within a few months of vesting pension rights, where-as Shahid, even if eligible to participate in the VTP, had no entitlement to the benefits since Ford had no obligation to offer the VTP and could terminate the plan at any time. Furthermore, the plain language of the VTP indicates that Ford's approval had to be obtained after an employee "accepted" or applied for benefits under the plan. Ford argues that since it had sole discretion to decide who would participate in the VTP, Ford would not violate section 510 even if it had chosen to deny Shahid the right to par-ticipate solely to save money.

■ We reject Ford's narrow view of section 510. Section 510 prohibits interfer-ence with rights to which an employee "may become entitled" under "an employee benefit plan" and does not limit its application to benefits that will become vested. *See Heath*

*v. Varity Corp.*, 71 F.3d 256, 258 (7th Cir. 1995) (noting that "[s]ection 510 does not distinguish between vested and unvested benefits"); *Seaman v. Arvida Realty Sales*, 985 F.2d 543, 546 (11th Cir.) (stating that "[t]he validity of a § 510 claim does not hinge upon whether the benefits involved are vested but upon the purpose of the discharge"), *cert. denied*, —— U.S. ——, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993); *Conkwright v. Westinghouse Electric Corp.*, 933 F.2d 231, 236–37 (4th Cir.1991) (recognizing an action under section 510 where employees claimed "denial not of their vested rights but of their ability to accrue additional benefits"). As indicated above, the term "employee benefit plan" includes "both pension and benefit plans; the former category includes some vested benefits, the latter does not." *Heath*, 71 F.3d at 258. In fact, ERISA "expressly exempts employee welfare benefit plans from the sections concerned with vesting and accrual." *See West v. Greyhound Corporation*, 813 F.2d 951, 954 (9th Cir.1987) (citing ERISA § 201(1), 29 U.S.C. § 1051(1)). Furthermore, the term "employee benefit plan" does not exclude discretionary plans. *Cf. Firestone*, 489 U.S. at 113, 109 S.Ct. at 955–56. Thus, Ford's argument that no claim can be stated under section 510 where the employer is not obligated to provide the benefit plan at issue is without merit.

■ In *Heath*, where an employee was fired shortly before he was to become eligible for early retirement benefits, the Seventh Circuit rejected a similar argument. 71 F.3d at 257–58. The district court in that case had held that "even if [the employer] fired [the employee] for the purpose of preventing him from becoming eligible for early retirement benefits, such a step would not violate § 510 because the employer could have abolished the entire early retirement plan." *Id.* at 257. The district court in *Heath* reasoned that "[t]he greater power to abolish the plan entails the lesser power to deny benefits to particular persons...." *Id. See Heath v.*

*Massey–Ferguson Parts Co.*, 869 F.Supp. 1379 (E.D.Wis.1994). The Seventh Circuit rejected the district court's approach because it would indicate that "§ 510 protects only persons who lay claim to (or seek to qualify for) vested benefits, which ERISA prevents an employer from abolishing." 71 F.3d at 257. We agree with the Seventh Circuit's conclusion that "ERISA draws a line between an employer's right to modify or abolish a plan—which it may do without acting as a fiduciary for the workers—and the employer's duty to provide employees the benefits of existing plans." *Id.* at 258 (citing *Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 1002 (7th Cir.1993) (noting that "employers are free to alter or disestablish ... plans at will" if the ERISA pension or welfare plan is established unilaterally), *aff'd*, —— U.S. ——, 115 S.Ct. 981, 130 L.Ed.2d 932 (1995), and *Teumer v. General Motors Corp.*, 34 F.3d 542, 545 (7th Cir.1994) ("repeatedly amending the terms of a plan immediately before an employee is about to achieve eligibility for benefits under the pre-altered plan, even if done specifically to avoid payment of benefits to the employee, is not prohibited by § 510 because it is not an action taken against the employment situation itself.")).

■ Although Ford's argument is sensible in that an employer should not be penalized for offering gratuitous benefits, ERISA was designed to protect employees' expectations in benefit plans. *See* ERISA § 2(a), 29 U.S.C. § 1001(a) (stating policy reasons for enactment of ERISA). Moreover, plans such as the VTP benefit companies such as Ford by helping them attract and retain desirable employees, and section 510 makes employers' promises of benefits credible. *Heath*, 71 F.3d at 258. According to the balance struck by Congress,[2] employees' reliance on ERISA plans is protected until an employer complies with the applicable amendment or termination procedure. *See Deeming v. American Standard, Inc.*,

---

2. In *Heath*, the Seventh Circuit also states, as an alternative explanation for the apparent contradiction noted by the district court (*i.e.*, that an employer is free to modify or abolish a plan but must ensure that each employee receives his or her full benefits), that it reflects a legislative compromise whereby "employers won a battle and secured the right to modify plans, while employees prevailed in a different skirmish and secured the right to qualify for benefits under existing plans...." *Id.* at 258. *See also Seaman*, 985 F.2d at 546–47.

905 F.2d 1124, 1128–29 (7th Cir.1990) (holding that amending a plan to prevent the attainment of a pension right does not amount to discrimination within the meaning of section 510); *Fuller v. FMC Corp.*, 4 F.3d 255, 258 (4th Cir.1993) (finding that a severance plan "is an employee welfare benefit plan whose benefits do not vest, and an employer may amend or eliminate its severance pay plan"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1062, 127 L.Ed.2d 382 (1994). Therefore, even when an employer offers a plan that it could amend or terminate at any time before vesting, ERISA dictates that the employer must follow the terms of any plan while it remains in effect. *See Seaman,* 985 F.2d at 547 ("If the employer decides to offer benefits, it must allow its employees to take advantage of the plan and must administer the plan in a nondiscriminatory fashion.").

 Although Ford may exercise discretion in determining who is eligible for the VTP, it must do so according to the criteria specified in the plan.[3] Thus, we reject Ford's argument that it could not have discriminated against Shahid because it was not obligated to offer the VTP. Having alleged that she would have become eligible for the VTP absent Restuccia's misrepresentations and/or Ford's unwarranted decision to terminate her employment, Shahid met her burden of stating a prima facie case under section 510.

### V

 Ford is entitled to summary judgment, nonetheless, because the district court correctly found that Shahid failed to show that Ford's legitimate nondiscriminatory reason for terminating her employment was pretextual. Once the employer articulates a legitimate nondiscriminatory reason for the employee's termination to rebut the presumption raised by the plaintiff's prima facie case, the production burden shifts back

to the plaintiff who must "either prove that the interference with pension benefits was a motivating factor in the employer's actions or prove that the employer's proffered reason is unworthy of credence." *Humphreys,* 966 F.2d at 1043.

Shahid argues that genuine issues of material fact exist as to whether Ford terminated her for violating company policy and whether Ford should have imposed progressive discipline instead. Citing Restuccia's deposition testimony, Shahid asserts that although Restuccia stated that he was the individual who made the ultimate decision to terminate Shahid, he did not know whether Shahid had been terminated for violating Ford's Policy Letter C–3. But Shahid overstates Restuccia's testimony. Although Restuccia testified that he did not know whether Shahid had been terminated for violating Policy Letter C–3, he unequivocally stated that she was terminated "[b]ecause of the nature of her actions in dealing with an outside supplier." In addition, Ford indicated to Shahid by letter dated February 15, 1991, that she was discharged "for violation of Policy Letter No. 3."

Shahid further argues that Restuccia testified that she should have received progressive discipline, but again this mischaracterizes the testimony. Restuccia only stated that Ford used progressive discipline for "certain situations in the company." Shahid insists that, in light of her excellent performance ratings, she should not have been summarily dismissed; however, Shahid offers no evidence to show that she was entitled to progressive discipline for the type of misconduct that resulted in her discharge. In contrast, Leo Seguin, an Employee Relations Associate for Ford, stated in his affidavit that Ford's consistent practice had been to discharge employees who violate Policy Letter C–3 and that Shahid's conduct "warranted termination," not progressive disci-

---

**3.** To the extent that Shahid claimed a right to recovery of benefits under ERISA § 502, 29 U.S.C. § 1132(a)(1)(B), which is the statutory mechanism for individuals to enforce their contractual rights under an employee benefit plan, the district court rejected the claim, finding that Ford was not arbitrary and capricious in deciding that Shahid was ineligible for the VTP. Sha-

hid did not appeal that decision, and thus it is not before this court. Therefore, the present discussion is limited to section 510 and whether Ford interfered with Shahid's right to become eligible for the VTP. *See Tolle v. Carroll Touch, Inc.,* 977 F.2d 1129, 1134 (7th Cir.1992) (describing the distinction between section 510 and section 502).

pline. Furthermore, Policy Letter C–3 states that violators "may be dismissed."

Finally, Shahid contends that Ford fraudulently induced her to postpone her "acceptance" of the VTP because Restuccia told her that Ford planned to make some changes to the Plan that might benefit her. According to Shahid, the deposition testimony of JoAnn Peck, an Employee Relations Associate for Ford, that the overall structure of the VTP remained the same, suggests that Ford had no reason to encourage her to wait to submit her paperwork other than to deny her benefits under the VTP. Thus, Shahid argues that Restuccia fraudulently induced her into delaying her "acceptance" of the VTP and that the additional time allowed Ford to investigate the policy violation that led to her termination.

Shahid's claim misstates the facts and, even if true, would not suffice to show pretext. Restuccia recommended that Shahid postpone her decision about the VTP because Ford's board of directors was considering a new "special early retirement" program that may have been more beneficial to her. Furthermore, Shahid's argument about the time delay hinges on her misreading of the VTP as requiring the employee to terminate his or her employment within two weeks of the employee's decision to "accept" the plan, allowing Ford only two weeks within which to revoke it. Although the VTP states that the termination date is "normally set two weeks from when the employee has reached the decision to terminate," as the district court noted, this "language establishes only a general time framework and in no way limits Ford's right to revoke the VTP offer prior to the effective date of termination." "Normally" does not mean "always;" moreover, Shahid's situation was not normal because Ford discovered that she had accepted and/or coerced kickbacks from an outside supplier. Furthermore, even if Shahid had not heeded Restuccia's advice and had submitted her application for the VTP on December 17, 1990, she still would have been terminated for accepting kickbacks before the VTP became final. Under the terms of the VTP, both Ford and the employee had the right to revoke Shahid's election to participate in the VTP any time before the effective termination date. Therefore, the investigation would have delayed the "necessary approvals" and the setting of a termination date.

Thus, Shahid did not establish that Ford's articulated reason for terminating her, *i.e.,* Shahid's misconduct, was pretextual. Ford discovered that Shahid had been receiving kickbacks when Ruby Thompson, the president of the travel company, sent a letter to Ford dated December 4, 1990, describing Shahid's acceptance and coercion of kickbacks and attaching copies of cancelled checks and a summary of invoices and payments. The date of Thompson's letter and the attached documentation show that Ford did not invent this violation or control the timing of its surfacing from a source outside the company. Shahid offered no plausible basis for this court to conclude that Ford's proffered reason for terminating her employment is not worthy of belief. There is no genuine issue of material fact, and Ford is entitled to judgment as a matter of law since Shahid has failed to meet her burden of production with evidence that Ford's legitimate nondiscriminatory reason for terminating her employment was pretextual. Accordingly, we **AFFIRM** the district court's grant of summary judgment in favor of Ford.